UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

James Allen Martin,

               Petitioner,

    vs.                       REPORT AND RECOMMENDATION

Dean Mooney,

               Respondent.     Civ. No. 06-1605 (DSD/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

I.  <u>Introduction</u>

This matter came before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. §636(b)(1)(B), upon a Petition for a Writ of Habeas Corpus, under <u>Title 28 U.S.C. §2254</u>, see, <u>Docket No. 1</u>, which alleges that the Petitioner is being illegally detained, by the Respondent, for reasons which violate his rights under the Constitution, laws, or Treaties of the United States.  The Petitioner appears <u>pro se</u>, and the Respondent appears by Janice M. Allen, Assistant Anoka County Attorney.  For reasons which follow, we recommend that the Petition be dismissed with prejudice. See, <u>Rule 4 of The Rules Governing Section 2254 Cases In The United States District</u>

Courts ("If it plainly appears from the petition and any attached exhibits that the petitioner is not entitled to relief in the district court, the judge must dismiss the petition and direct the clerk to notify the petitioner.").

## II.  Factual and Procedural Background

In 2004, the Minnesota District Court for Anoka County found the Petitioner to be a Sexually Dangerous Person ("SDP"), as defined by Minnesota Statutes Section 253B.02, Subdivision 18c.  As a result, the Petitioner has been civilly committed for treatment, and for public protection.  He is currently confined, under the Minnesota Sex Offender Program ("MSOP"), at a treatment facility in Moose Lake, Minnesota. The Petitioner is seeking a Writ of Habeas Corpus that would release him from custody.[1]

------

[1] The Petition has been timely filed for, on February 15, 2005, the Minnesota Court of Appeals upheld the Petitioner's final commitment as a "Sexually Dangerous Person ("SDP")," and the Minnesota Supreme Court denied his Petition for further review on April 19, 2006.  Although the Petitioner could have petitioned the United States Supreme Court for certiorari, he did not.  Nonetheless, the statute of limitations was tolled for a period of ninety (90) days -- that is, during the period in which certiorari could have been sought.  See, Smith v. Bowersox, 159 F.3d 345, 348 (8th Cir. 1998), cert. denied, 525 U.S. 1187 (1999)(The running of the statute of limitations, for purposes of Title 28 U.S.C. §2244(d), is triggered by the completion or denial of certiorari proceedings before the United States Supreme Court or, "if certiorari was not sought, then by the conclusion of all direct criminal appeals in the state system followed by the expiration of the [90 days] allowed for filing a petition for the writ.");

(continued...)

A.   <u>Factual Basis For State Commitment Proceedings</u>.

The events that led to the Petitioner's current confinement began to unfold in 1991, when he was a senior at Augsburg College, in Minneapolis, Minnesota.  See, <u>Respondent's Appendix ("Appendix")</u>, <u>Docket No. 9</u>, at p. 42.  He discovered that, from the window of a friend's dormitory room, he could watch an unclothed female student ,through the window of her room.  <u>Id.</u>  The Petitioner "began masturbating to fantasies of her," and decided to contact her, and ask her to go out on a date with him, telling her that he had "seen her naked through her window and that he 'liked' her."  <u>Id.</u>  The woman, whose name was Jane, rejected the Petitioner's invitation, which caused him to be angry with her.  <u>Id.</u>  The Petitioner was quite overweight at the time, and he thought Jane had rejected him because of his obesity.  <u>Id.</u>

The Petitioner's anger toward Jane intensified during the following two (2) months, and he began to think of ways to humiliate her.  <u>Id.</u>  With the help of a

---

[1](...continued)
see also, <u>Curtiss v. Mount Pleasant Correctional Facility</u>, 338 F.3d 851, 853 (8th Cir. 2003), cert. denied, 540 U.S. 1060 (2003).

As a consequence, the Petitioner could file his Petition before July 19, 2006, and the Petition would be timely.  Here, the Petition was filed on April 27, 2006.

roommate, the Petitioner enticed Jane to come to his room and, when she arrived, he verbally insulted her and derided her.  <u>Id.</u>  He recorded the event on a videotape, which he labeled "Revenge on Jane."  <u>Id.</u> at 43.  The tape shows the Petitioner's "jubilation" about the incident.  <u>Id.</u>  The Petitioner also made another videotape of Jane in her room, which he surreptitiously recorded from his friend's dormitory room. <u>Id.</u>

After Jane left the campus at the end of the school year, the Petitioner discovered where she was living, and working, during the Summer.  <u>Id.</u>  He went to Jane's hometown of Detroit Lakes, Minnesota, and began making plans to rape and murder her, going to Jane's family home three (3) times.  <u>Id.</u>  The first time, he broke a basement window and entered while no one was at home.  <u>Id.</u>  Carrying a .38 caliber pistol, the Petitioner waited for Jane, in her bedroom, for about an hour and a half, but left before Jane and her family returned.  <u>Id.</u>  On the second occasion, the Petitioner broke into Jane's home, at about 4:00 o'clock a.m., by cutting a hole in a screen, but he was quickly frightened away by movement in the house.  <u>Id.</u> at pp. 43-44.

A week later, again at about 4:00 o'clock a.m., the Petitioner approached Jane's home for a third time, carrying a hunting knife.  <u>Id.</u>  A neighbor saw the Petitioner's car and alerted Jane's family.  <u>Id.</u>  The Petitioner drove away, but the neighbor, and

Jane's father, followed him in the neighbor's car.  Id.  As the Petitioner was being chased, he fired three pistol shots at the other car, striking the windshield of the car, but not its occupants.  Id. at p. 44.

Three (3) days later, the Petitioner was arrested near Jane's home.  Id.  In his car, the Sheriff's deputies found "a loaded .38 caliber pistol with extra ammunition, a hunting knife, a roll of duct tape, three lengths of rope, four tent stakes, a bull whip, a bottle of Vaseline, a pair of cotton gloves, a pair of latex gloves, a spade (shovel), a video camera and tripod, and the two video cassettes he had taken of [Jane]."  Id. The Petitioner later told a psychiatrist, and a psychologist that, "when he broke into [Jane's] house, he intended to kidnap, rape, murder and bury her."  Id.  He also explained to the psychiatrist how the items, which were found in his car, were to be employed in carrying out that plan.  Id. at p. 45.

Subsequently, the Petitioner pled guilty to two (2) counts of Second Degree Assault, for shooting at the neighbor's car during his, and Jane's father's, pursuit of the Petitioner.  Id.  Pursuant to a plea agreement, two (2) pending Burglary charges were dismissed.  Id.  The Petitioner received a 72-month prison sentence for one (1) assault conviction, and a 36-month stayed sentence for the other.  Id. at p. 46.

The Petitioner began serving his prison sentence at the Minnesota Correctional Facility, in St. Cloud, Minnesota, ("MCF-SCL"). Id. at 47. While he was there, he "began to engage in obsessive stalking behavior" toward a female correctional officer named Jill. Id. The Petitioner often stared at Jill, tried to get close to her, and asked her questions about her personal life. Id. Jill became fearful of the Petitioner, and tried to keep him away from her, but the Petitioner continued to stalk her as his circumstances allowed. Id. The Petitioner told a fellow inmate that he wanted to marry Jill when he got out of prison, and that he would kill her if she refused. Id. at p. 48. Jill was extremely frightened by the Petitioner's behavior, and the Petitioner was transferred to a more secure facility, where he was supposed to receive "sex offender treatment." Id. at pp. 48-49. However, the Petitioner refused to actively participate in the treatment program. Id. He later returned to MCF-SCL, but was sent back to the more secure facility again, after getting into a fight with another inmate. Id. at p. 50.

By August of 1995, the Petitioner was nearing his release date on his 72-month sentence. Id. However, the Sentencing Court then vacated the stay of his 36-month sentence, because of his refusal to participate in the sex offender treatment program. Id. at pp. 51-52. During the remainder of his State prison term, the Petitioner

- 6 -

threatened correctional officials, was cited for numerous disciplinary infractions, and was regularly transferred from one (1) institution to another. <u>Id.</u> at p. 52. His "tirades against female correctional officers were couched in sexually derogatory language with sexual overtones." <u>Id.</u> at p. 53.

On October 23, 1997, the Petitioner finally was released from State prison on parole and, shortly thereafter, began searching for new information about Jill, the MCF-SCL prison guard. <u>Id.</u> He knew that Jill had filed a civil lawsuit in the Minnesota District Court for Sherburne County, and he searched that Court's records to find out more about her. <u>Id.</u> at pp. 53-54. On December 31, 1997, the Petitioner stole some papers from the Court files which related to Jill's Sherburne County lawsuit. <u>Id.</u> On the same day, he bought "a pistol grip semi-automatic shotgun at a local gun store." <u>Id.</u> at p. 54.

Five (5) days later, the Petitioner was apprehended by his parole officer, and some police officers. <u>Id.</u> The Petitioner was carrying a can of Mace spray, and a steak knife in his pockets. <u>Id.</u> In the Petitioner's car, the officers found "the loaded shotgun, a pair of handcuffs, and a roll of duct tape." <u>Id.</u> The parole officer also found some handwritten notes in the Petitioner's car, which contained: (1) the names and addresses of people with the same last name as Jill; (2) a list of gun shops; (3) the

names of various Judges, prosecutors, and law enforcement officials; and (4) the names and addresses of various correctional officers.  The parole officer also found the stolen Court documents, which pertained to Jill's lawsuit.  <u>Id.</u> at p. 55.  The Petitioner told his parole officer that he had purchased the shotgun, because he had been thinking about killing himself.  <u>Id.</u>  He was unable to explain why he had the handcuffs and duct tape.  <u>Id.</u>  The Petitioner admitted that he had been thinking about "going after" Jill, but told the parole officer that "wanting and doing are two separate things."  <u>Id.</u>  The Petitioner was arrested, and charged with violating Federal law, by being a Felon in Possession of a Firearm.  <u>Id.</u>

In January of 1998, the Petitioner pled guilty in the United States District Court for the District of Minnesota to the Federal firearm charge that had been filed against him.  See, <u>United States v. Martin</u>, Crim. No. 98-27 (JRT/JGL).  He was sentenced to 52 months in Federal prison, which was an upward departure from the Sentencing Guidelines.  The Petitioner's conviction, and sentence, were later upheld by the United States Court of Appeals for the Eighth Circuit.  See, <u>United States v. Martin</u>, 195 F.3d 1018 (8th Cir. 1999).  The Court of Appeals specifically approved the length of the Petitioner's sentence, noting as follows:

> [T]he circumstances in which the firearm was discovered
> persuasively evidence Martin's intent to use the weapon in
> committing a potentially violent felony against one or more
> persons. The only uncertainty was the identity of Martin's
> next victim and the precise nature of the offense he
> intended to commit.

Id. at 1019-20.

The Petitioner was also charged, and convicted, under Minnesota law, with stealing

the Court documents from Jill's civil lawsuit in Sherburne County.[2] Appendix, supra

at p. 56. He received a one-year jail sentence for that offense, to be served

concurrently with his 52-month Federal sentence. Id. The Petitioner spent much of

his Federal prison term in a "Special Housing Unit," because of various disciplinary

problems. Id. at p. 58.

    B.    <u>Initial Civil Commitment Proceedings</u>.

       In December of 2001, as the Petitioner was approaching the end of his

Federal prison term, Social Services, in Anoka County, Minnesota, filed a Petition in

the Minnesota District Court for Anoka County, seeking to have the Petitioner civilly

committed, as an SDP, pursuant to Minnesota Statutes Section 253B.02, Subdivision

---

[2]The Respondent has pointed out that, during the ten (10) days in which the Petitioner was held at the Sherburne County Jail, in connection with the pending State criminal charges against him, he was involved in several disciplinary incidents, and he threatened Jail personnel. See <u>Respondent's Appendix ("Appendix")</u>, <u>Docket No. 9</u>, at p. 57.

17, and as a person who is "Mentally Ill and Dangerous" ("MI&D"), pursuant to Minnesota Statutes Section 253B, Subdivision 18c. <u>Id.</u> at p. 38. The State Court entered a "Hold Order," which caused the Petitioner to be taken into State custody upon his release from Federal prison. <u>Id.</u>

The initial civil commitment Petition was dismissed, without prejudice, on March 5, 2002, because a Hearing in the matter was not completed within the time frame prescribed by State law. <u>Id.</u> at p. 39. However, the Petitioner apparently remained in custody, and a new civil commitment Petition was filed immediately after the first Petition was dismissed. <u>Id.</u> The parties agreed that the psychological reports, which were filed in connection with the original Petition, should be used in connection with the new Petition, and it appears that, as a practical matter, the filing of the new Petition had no bearing on the commitment proceedings. <u>Id.</u>

During the course of the civil commitment proceedings, the Petitioner was examined by two (2) Court-appointed forensic psychologists, James Gilbertson, Ph.D., and -- at the Petitioner's request -- Paul Reitman, Ph.D. <u>Id.</u> at p. 38. Both doctors prepared written reports on the Petitioner, which were admitted as evidence at the

hearing on the Commitment Petition.[3] Id. Both doctors also testified at the Hearing. Id. at p. 41.

The Court Hearing, on the Commitment Petition, which was conducted by a State Court Judge without a Jury, took place over the course of eight (8) days, in March and April of 2002. Id. at p. 30. The Petitioner was represented, at the Hearing, by an Anoka County Public Defender. Id.

In July of 2002, the State Court Judge entered an Order that: (1) denied the Petitioner's Motion to Dismiss the commitment proceedings due to alleged constitutional deficiencies; (2) denied the County's Petition to have the Petitioner civilly committed as an SDP; and (3) granted the County's Petition to have the Petitioner civilly committed as an MI&D person. Id. at p. 31. The State Court's initial two-page "MI&D Order for Commitment," which is dated July 30, 2002, id. at pp. 30-31, was followed by a much more extensive opinion entitled "Findings of Fact,

_____

[3]Dr. Gilbertson's twenty (20) page report, which is dated January 22, 2002, is included in the Record, see, Appendix, supra at pp. 9-28. Dr. Reitman's fourteen (14) page report, which dated February 23, 2002, is contained in Appendix, supra at pp. 101-14.

Conclusions of Law, and Memorandum in Support of Previously Filed MI&D Order

For Commitment," which was filed on October 4, 2002.  Id. at pp. 36-98.[4]

The Trial Court found that Anoka County had not proven all of the elements

that are set forth in Minnesota's SDP law, and that is codified at Minnesota Statutes

Section 253B.02, Subdivision 18c(a).  The Statute provides as follows:

> A 'sexually dangerous person' means a person who:
>
> (1)     has engaged in a course of harmful sexual conduct as
>         defined in subdivision 7a;
>
> (2)     has manifested a sexual, personality, or other mental
>         disorder or dysfunction; and
>
> (3)     as a result, is likely to engage in acts of harmful
>         sexual conduct as defined in subdivision 7a.

In turn, Minnesota Statutes Section 253B.02, Subdivision 7a provides as follows:

> (a)     'Harmful sexual conduct' means sexual conduct that
>         creates a substantial likelihood of serious physical or
>         emotional harm to another.
>
> (b)     There is a rebuttable presumption that conduct
>         described in * * * [various sections of the State
>         Criminal Code] creates a substantial likelihood that
>         a victim will suffer serious physical or emotional

---

[4]Our recitation of the factual background of this case, as set forth above, is based largely on this comprehensive Trial Court document.

harm: * * *.[5]  If the conduct was motivated by the
person's sexual impulses or was part of a pattern of
behavior that had criminal sexual conduct as a goal,
the presumption also applies to conduct described in
[various sections of the State Criminal Code].[6]

The Minnesota SDP Statute states that, in order for a person to be declared an SDP,

"it is not necessary to prove that the person has an inability to control the person's

sexual impulses."  Minnesota Statutes Section 253B.02, Subdivision 18c(b).

However, the Minnesota Supreme Court has interpreted the language of the

Statute to require proof that the person, who faces commitment, cannot "adequately

control" his or her "sexual impulses."  In re Linehan, 594 N.W.2d 867, 876 (Minn.

---

[5]The omitted Code sections are section 609.342 (CRIMINAL SEXUAL CONDUCT IN THE FIRST DEGREE), 609.343 (CRIMINAL SEXUAL CONDUCT IN THE SECOND DEGREE), 609.344 (CRIMINAL SEXUAL CONDUCT IN THE THIRD DEGREE), or 609.345 (CRIMINAL SEXUAL CONDUCT IN THE FOURTH DEGREE).

[6]The omitted sections of the Code are section 609.185 (MURDER IN THE FIRST DEGREE), 609.19 (MURDER IN THE SECOND DEGREE), 609.195 (MURDER IN THE THIRD DEGREE), 609.20 (MANSLAUGHTER IN THE FIRST DEGREE), 609.205 (MANSLAUGHTER IN THE SECOND DEGREE), 609.221 (ASSAULT IN THE FIRST DEGREE), 609.222 (ASSAULT IN THE SECOND DEGREE), 609.223 (ASSAULT IN THE THIRD DEGREE), 609.24 (SIMPLE ROBBERY), 609.245 (AGGRAVATED ROBBERY), 609.25 (KIDNAPPING), 609.255 (FALSE IMPRISONMENT), 609.365 (INCEST), 609.498 (TAMPERING WITH A WITNESS), 609.561 (ARSON IN THE FIRST DEGREE), 609.582, subdivision 1 (BURGLARY IN THE FIRST DEGREE), 609.713 (TERRORISTIC THREATS), or 609.749, subdivision 3 or 5 (HARASSMENT AND STALKING).

1999), cert. denied, 528 U.S. 1049 (1999); see also, In re Civil Commitment of Stone, 711 N.W.2d 831, 836 (Minn. App. 2006); In re Martinelli, 649 N.W.2d 886, 888 (Minn. App. 2002). As summarized by the Minnesota Supreme Court, "the SDP Act allows civil commitment of sexually dangerous persons who have engaged in a prior course of sexually harmful behavior and whose present disorder or dysfunction does not allow them to adequately control their sexual impulses, making it highly likely that they will engage in harmful sexual acts in the future." Id.

In the Petitioner's case, the Trial Court identified four (4) distinct elements that must be proven, by clear and convincing evidence, before an individual can be found to be an SDP: (1) the individual must have engaged in a course of "harmful sexual conduct" in the past; (2) the individual must have a "present personality disorder;" (3) the individual must lack "adequate control over his harmful sexual impulses;" and (4) there must be a high likelihood that the individual will engage in harmful sexual conduct in the future. See, Appendix, supra at p. 71. The Petitioner apparently accepts the Trial Court's listing of those four SDP requirements. See, Petitioner's Memorandum In Support, Docket No. 2, at p. 46.[7]

---

[7]Our Court of Appeals has intimated that the SDP Act has "three requirements for commitment: [1] past course of harmful sexual conduct, [2] proof of a disorder that
(continued...)

After identifying the requirements for an SDP determination, the Trial Court proceeded to consider whether the County had satisfied each of those four (4) requirements by clear and convincing evidence. The Trial Court first found that the Petitioner had engaged in a course of past harmful sexual conduct with regard to Jane, the Augsburg College student, but that he had not done so with regard to Jill, the State prison guard. See, Appendix, supra at p. 81. Turning to the second element, the Trial Court found, based on the reports of Drs. Gilbertson and Reitman, that the Petitioner did have a mental disorder or dysfunction, which the doctors described as a "'Personality Disorder N.O.S.' (not otherwise specified)." Id. at p. 82.

However, the Trial Court concluded that Anoka County had not proven the third SDP element; namely, that the Petitioner lacked adequate control over his

---

[7](...continued)

results in lack of adequate ability to control behavior, and [3] high likelihood of engaging in future harmful sexual conduct." Linehan v. Milczark, 315 F.3d 920, 925 (8th Cir. 2003). This listing of the SDP requirements is essentially the same as the four-part description, which was employed by the Trial Court in the Petitioner's case, because the second and third elements, that were described by the Trial Court -- a mental disorder and lack of adequate control over sexual impulses -- are simply combined in the second requirement identified by the Eighth Circuit as "proof of a disorder that results in lack of adequate ability to control [sexual] behavior." For these purposes, we accept and utilize the four-part description of the SDP Act requisites, as they are advanced by the Trial Court, and the Petitioner.

harmful sexual impulses.  Id. at pp. 89-93.[8]  Having determined that the County had

failed to sustain its burden of proof on the third SDP requirement, the Trial Court

found it unnecessary to make a decision on the fourth element.  Id. at p. 93.

Since the County had not satisfied the third SDP requirement, the Trial Court

did not find the Petitioner to be an SDP, but the Petitioner remained in custody, based

on the Court's determination that he was MI&D.  Id. at pp. 95-98.  In accordance with

--------

[8]The Trial Court reasoned as follow:

> The evidence at trial showed that [the Petitioner] had the opportunity to commit criminal sexual penetration/contact upon [Jane] at the Augsburg campus in the spring of 1991 or at/around her place of work in Detroit Lakes that summer.  But he didn't.  He had the intent -- the impulse -- to rape [Jane], if she had been home when he burglarized her parents' home later that summer.  But she wasn't home.  So, we will never know (thank God) whether, if [Jane] had been home, he would have yielded to that 'impulse' and actually raped her.  Further, whatever his impulses may have been at the MCF-St. Cloud in early 1993, he never yielded to those impulses and committed criminal sexual penetration/contact upon correctional officer [Jill].
>
> So, the evidence at trial is **not** clear and convincing that [the Petitioner] lacks adequate control over his harmful sexual impulses.  To reach any other conclusion would be sheer speculation.  And the 'clear and convincing' standard hardly allows for speculation.

Appendix, supra at p. 89 [emphasis in original].

- 16 -

Minnesota Statutes Section 253B.18, Subdivision 2, the Petitioner was sent to the

Minnesota Security Hospital ("MSH"), in St. Peter, Minnesota, for further evaluation

of his status as an MI&D person.  Id. at p. 31.  After that evaluation was completed,

the State Trial Court conducted a further "Review Hearing," in November of 2002,

for the purpose of determining whether the Petitioner should remain confined

indeterminately, as an MI&D person.  See, Minnesota Statutes Section 253B.18,

Subdivision 3.

After considering the evidence presented at the Review Hearing, which

included new reports from four (4) MSH forensic psychiatrists, the Trial Court found

that "the reports and testimony received at the review hearing have amplified and

changed the overall record to such an extent that there is no longer clear and

convincing evidence that [the Petitioner] is 'mentally ill' -- as defined in Minn. Stat.

§253B.01, subd. 13 -- for purposes of an MI&D commitment."  Appendix, supra at

p. 6.  Therefore, by Order dated November 27, 2002, the County's Petition to have the

Petitioner committed as an MI&D person was denied, and the Petitioner was granted

release from custody. <u>Id.</u> at p. 6. However, the Trial Court stayed the release Order, and the County filed an appeal.[9] <u>Id.</u>

    C.    <u>The First Appeal ("Martin I")</u>.

On appeal, the County apparently did not question the Trial Court's determination that the Petitioner is not an MI&D person, but instead, challenged the Trial Court's determination that the Petitioner is not an SDP. The Petitioner cross-appealed the Trial Court's rulings on the constitutional challenges he had raised. See, <u>In the Matter of the Civil Commitment of Martin</u>, 661 N.W.2d 632 (Minn. App. 2003), rev. denied (Minn., Aug. 5, 2003)(<u>"Martin I"</u>).[10]

In <u>Martin I</u>, the Minnesota Court of Appeals rejected the Trial Court's determination, on the first SDP element, that the Petitioner had not engaged in past harmful sexual conduct toward Jill, the prison guard.[11] However, that ruling appears

_____

[9]The Petitioner apparently remained in custody while the appeal was pending, and thereafter.

[10]A copy of <u>In the Matter of the Civil Commitment of Martin</u>, 661 N.W.2d 632 (Minn. App. 2003), rev. denied (Minn., Aug. 5, 2003)("<u>Martin I</u>"), is included in the present record at <u>Appendix</u>, supra at pp. 175-84.

[11]The Court of Appeals explained its decision as follows:

    [T]he record shows that [the Petitioner] violated the terms

    (continued...)

- 18 -

to be relatively insignificant, because the Trial Court had already determined that the

first requirement of the SDP statute had been satisfied, by reason of the Petitioner's

harmful sexual conduct toward his other victim, Jane.

The Court of Appeals' ruling on the third SDP requirement -- the lack of

adequate control over harmful sexual impulses -- was far more significant.  The Court

independently reviewed the reports, and trial testimony of Drs. Reitman and

Gilbertson, as well as the record of Petitioner's past behavior toward Jane and Jill, and

concluded as follows:

> A review of [the Petitioner's] sexual behavior since 1991
> supports the experts' opinions that [the Petitioner] cannot
> adequately control his sexual impulses:  he broke into one
> victim's home repeatedly after planning and equipping
> himself to abduct, rape, and murder her; he stalked and

---

[11](...continued)
> of his supervised release, took court documents relating to
> [Jill's civil lawsuit] * * *, and was apprehended possessing
> a shotgun, handcuffs, duct tape, mace, and a steak knife.
> Moreover, [the Petitioner] professed to Dr. Reitman in 1998
> that he was still sexually attracted to [Jill] and that he
> fantasized about her; Dr. Reitman testified that [the
> Petitioner's] behavior toward [Jill] in 1997 closely mirrored
> his conduct toward [Jane, the Augsberg College student] in
> 1991.  Drs. Reitman and Gilbertson both concluded that
> [the Petitioner's] behavior toward [Jill] after he left prison
> in 1997 was motivated by sexual impulses.

Martin I, at 638.

> harassed a female guard at the facility where he was
> incarcerated; he told another inmate that he would kill the
> guard if she refused to marry him; he later bought a
> shotgun, stole court documents relating to the guard, and
> compiled a list of people with the guard's last name who
> lived near the facility; he has continually engaged in
> harassing, violent, and threatening behavior to females in
> correctional facilities and MSH.

Martin I, supra at 639.

The Court ultimately decided that "the evidence here compels a finding that [the Petitioner's] personality disorder does not allow him to adequately control his harmful sexual impulses and behavior." Id. at 639-40.

In addition, the Court rejected the Petitioner's constitutional challenges to the Minnesota SDP Statute, id. at 640-41, and remanded the case to the Trial Court for further consideration of the fourth SDP element, which had not previously been addressed. The Court of Appeals directed the Trial Court "to determine * * * whether it is highly likely that [the Petitioner] will engage in future harmful sexual conduct." Id. at 641. The Petitioner asked the Minnesota Supreme Court to review the Court of Appeals' decision, but that request was denied on August 5, 2003. See, Appendix, supra at p. 196.

D.     The Proceedings After Martin I.

Following the remand ordered by <u>Martin I</u>, the Trial Court conducted a further Evidentiary Hearing as to the question of whether it was highly likely that the Petitioner would engage in future harmful sexual conduct.   On January 2, 2004, the Trial Court entered a two (2) page Order holding that the Petitioner is an SDP, and that he should be civilly committed as such.   <u>Id.</u> at pp. 99-100.   The factual and legal bases for that Order were explained in a forty (40) page opinion entitled "Findings, Conclusions and Memorandum," which is dated May 20, 2004.   <u>Id.</u> at pp. 118-157. In that opinion, the Trial Court highlighted two (2) factors that affected the post-remand outcome of the SDP Trial:   (1) the findings and conclusions of the Court of Appeals in <u>Martin I</u>; and (2) Dr. Reitman's "revised opinion of the likelihood of [the Petitioner's] sexually re-offending."   <u>Id.</u> at p. 132.   At the post-remand Evidentiary Hearing, Dr. Reitman "modified his opinion about the likelihood of [the Petitioner's] engaging in sexually-motivated stalking; **he elevated that likelihood up from merely 'likely' to 'highly' likely**."   <u>Id.</u> at p. 145 [emphasis added by the Trial Court].

After the Trial Court made its initial post-remand determination, that the Petitioner should be committed as an SDP, the Petitioner was re-evaluated by the MSOP.   The Trial Court later held a post-evaluation Review Hearing, in order to

determine whether the Petitioner should be confined indeterminately.  On July 6, 2004, the Trial Court entered an Order that finalized the Petitioner's SDP determination, and directed that he be confined, indeterminately, under the MSOP. Id. at pp. 158-62.[12]

The Petitioner filed a second appeal after the final SDP Commitment Order was entered.  In that appeal he argued that "(1) the requirements for commitment as a sexually dangerous person are not met, and (2) because he never engaged in criminal sexual conduct, * * * [the SDP statute is] unconstitutional as applied to him."  In the Matter of the Civil Commitment of Martin, 2005 WL 354088 at *1 (Minn. App.,

---

[12]In the final post-evaluation Commitment Order, the Trial Court explained:

> At MSOP, [the Petitioner] continued his past conduct of threatening to remember and retaliate against staff in the future for perceived current mistreatment.  On 7/23/03, he told staff that he would remember their names and that they should remember who they were dealing with.   He continued to glare at staff for some period.  On 3/9/04, [the Petitioner] pointed his finger at a female staff person and repeatedly told her: 'When I get out of here I am coming back to this town and it is going to happen.  Trust me, it is going to happen.'  He added, 'And I will be going after the people in Anoka County, too.'

Appendix, supra at p. 160.

February 15, 2005)("Martin II").[13]   In Martin II, the Minnesota Court of Appeals

rejected all of the Petitioner's arguments, and upheld his civil commitment as an SDP.

Thereafter, Minnesota Supreme Court denied the Petitioner's request for further

review, on April 19, 2005.  See, Appendix, supra at p. 195.

      E.     The Petitioner's Current Request for Habeas Relief.

      On April 27, 2006, the Petitioner commenced this Federal Habeas

proceeding.  His Petition raises seven (7) claims for relief.  The first three (3) claims,

which are set forth in Ground One of the Petition, purportedly are based on

"Substantive Due Process."  The fourth claim, which is set forth as Ground Two, is

based on "Procedural Due Process."  Claims five, six, and seven, which appear in

Ground Three, are identified as "Equal Protection" claims.

His Equal Protection claims urge that: (1) it unconstitutional to apply the

Minnesota SDP statute to a person, such as the Petitioner, who has not been convicted

of a criminal sex offense, see, Petition, supra at p. (5), ¶12.A., Petitioner's

Memorandum, supra at pp. 48-59, Petitioner's Reply Memorandum, Docket No.13,

at pp. 2-7; (2) that, under Equal Protection, the Minnesota Court of Appeals violated

---

    [13]A copy of In the Matter of the Civil Commitment of Martin, 2005 WL 354088
at *1 (Minn. App., February 15, 2005)("Martin II"), is included in the present Record
at Appendix, supra at pp. 185-94.

the Federal Constitution, in <u>Martin I</u>, by rejecting the Trial Court's determination regarding his ability to control his "harmful sexual impulses," <u>Petition</u>, supra at p. (5), ¶12.A., <u>Petitioner's Memorandum</u>, supra at pp. 59-64, <u>Petitioner's Reply Memorandum</u>, supra at pp. 7- 10; (3) the Minnesota Court of Appeals violated the Federal Constitution by effectively eliminating the need for proof of an "inability to control" harmful sexual impulses in the Petitioner's SDP commitment proceedings, see, <u>Petition</u>, supra at p. (5), ¶12.A., <u>Petitioner's Memorandum</u>, supra at pp. 64-67, <u>Petitioner's Reply Memorandum</u>, supra at pp. 10-11; (4) the Minnesota SDP Act is unconstitutional, because the Act does not allow for a Jury determination of the factual prerequisites for an SDP commitment, <u>Petition</u>, p. (5), ¶12.B, <u>Petitioner's Memorandum</u>, supra at pp. 67-77, <u>Petitioner's Reply Memorandum</u>, supra at pp. 11-12; (5) the Minnesota SDP Act violates the Equal Protection Clause of the Federal Constitution, because the Act allegedly permits confinement of persons who have thoughts about committing criminal sexual conduct, but not for persons who have thoughts of committing non-sexual criminal conduct, <u>Petition</u>, supra at p. (6), ¶12.C., <u>Petitioner's Memorandum</u>, supra at pp. 78-79, <u>Petitioner's Reply Memorandum</u>, supra at pp. 13-14; (6) the Minnesota SDP Act violates the Equal Protection Clause of the Constitution, because the standard of appellate review for SDP commitments

- 24 -

assertedly is different from the standard used for other civil commitments, <u>Petition</u>, p. (6), ¶12.C., <u>Petitioner's Memorandum</u>, supra at pp. 78-81, <u>Petitioner's Reply Memorandum</u>, supra at p. 14; (7) the Minnesota SDP Act violates the Equal Protection Clause, because individuals who are committed as SDPs are not given the same opportunities for treatment and release as those given to other classes of civilly committed individuals, <u>Petition</u>, p. (6), ¶12.C., <u>Petitioner's Memorandum</u>, supra at pp. 81-82, <u>Petitioner's Reply Memorandum</u>, supra at pp. 14-16.

Notwithstanding these contentions, we find that the Petitioner is not entitled to a Writ of Habeas Corpus on any of his claims for relief.

## III.  <u>Discussion</u>

A.    <u>Standard of Review</u>.  "[A] district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." <u>Title 28 U.S.C. §2254(a)</u>. "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." <u>Estelle v. McGuire</u>, 502 U.S. 62, 68 (1991). As a result, before a Writ may issue, the Petitioner must establish that the State's exercise of custody over his person is an affront to the Constitution, a Federal

law, or a Federal treaty.  Id.; see also, Lupien v. Clarke, 403 F.3d 615, 618 (8th Cir.

2005); Newton v. Kemna, 354 F.3d 776, 782 (8th Cir.), cert. denied, 543 U.S. 979

(2004); Robinson v. Leapley, 26 F.3d 826, 829 (8th Cir. 1994).

In 1996, Congress restricted the scope of a Federal Court's review of Habeas

Petitions, where the underlying claims were adjudicated in State Court.   See,

Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat.

1214 (1996)("AEDPA"); see also, Lockyer v. Andrade, 538 U.S. 63, 70 (2003)

("AEDPA circumscribes a federal habeas court's review of a state court decision.").

A Federal Court's authority to vitiate State Court decisions, by the granting of a Writ

of Habeas Corpus, is now limited to the narrow class of claims which have been fully

exhausted in the State Courts, and which involve an adjudication that either:

> (1)    resulted in a decision that was contrary to, or
> involved an unreasonable application of, clearly established
> Federal law, as determined by the Supreme Court of the
> United States; or
>
> (2)    resulted in a decision that was based on an
> unreasonable determination of the facts in light of the
> evidence presented in the State Court proceeding.

Title 28 U.S.C. §2254(d).

The Supreme Court has determined that the "contrary to," and "unreasonable

application" clauses of Section 2254(d)(1), present two (2) separate grounds on which

a Federal Court may grant Habeas relief to claims adjudicated in the State Courts.

Williams v. Taylor, 529 U.S. 362 (2000).  The Court has explained:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrive[d] at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decide[d] a case differently than [the Supreme Court] has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifie[d] the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applie[d] that principle to the facts of the prisoner's case.

Id. at 412-13; see also, Penry v. Johnson, 532 U.S. 782, 792-93 (2001).

The Court further explained that a consideration of a State Court's decision, under the "unreasonable application" clause, requires a Federal Court to "ask whether the state court's application of clearly established federal law was objectively unreasonable." Williams v. Taylor, supra at 409; see also, Penry v. Johnson, supra at 792-93; Smulls v. Roper, 467 F.3d 1108, 1112-13 (8th Cir. 2006); Underdahl v. Carlson, 462 F.3d 796, 798 (8th Cir. 2006); LaFrank v. Rowley, 340 F.3d 685, 689 (8th Cir. 2003), cert. denied, 541 U.S. 950 (2004).

Under this heightened standard of review, a Federal Court "may not issue the writ simply because that court concludes in its independent judgment that the relevant

state court decision applied clearly established federal law erroneously or incorrectly," but "[r]ather, that application must also be unreasonable." Williams v. Taylor, supra at 411; see also, Underdahl v. Carlson, supra at 798; Siers v. Weber, 259 F.3d 969, 972-73 (8th Cir. 2001)(examining the impact of Williams on Habeas proceedings), cert. denied, 534 U.S. 1138 (2002); Newman v. Hopkins, 247 F.3d 848, 850-51 (8th Cir. 2001), cert. denied, 536 U.S. 915 (2002); Copeland v. Washington, 232 F.3d 969, 973 (8th Cir. 2000), cert. denied, 532 U.S. 1024 (2001).

As a consequence, Williams affirmed the distinction, which had previously been drawn by several Courts of Appeal, that the "contrary to" clause was to be used in cases addressing pure questions of law and mixed questions of law and fact, whereas the "unreasonable application" clause addressed factual determinations. See, e.g., Evans v. Rogerson, 223 F.3d 869, 872 (8th Cir. 2000)(the "in custody" determination for Miranda purposes is a question of law subject to the first prong of Section 2254(d), when the relevant facts are undisputed). Therefore, when a petitioner argues that the State Court improperly applied clearly established Supreme Court law to a particular set of facts, the Federal Courts may not grant a Writ absent a finding that such an application was unreasonable.

Additionally, Section 2254(e)(1) retains a presumption of correctness for all purely factual determinations, which are rendered by a State Tribunal, and which can, as a result, only be rebutted by the production of clear and convincing evidence to the contrary. See, Smulls v. Roper, supra at *9; Lupien v. Clarke,  supra at 618; Green v. Norris, 394 F.3d 1027, 1029 (8th Cir. 2005).  Despite this presumption, Section 2254(d)(2) authorizes the issuance of a Writ if the State Court Judgment "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Kinder v. Bowersox, 272 F.3d 532, 538 (8th Cir. 2001); Smulls v. Roper, supra at 1112-13; McDonald v. Bowersox, 101 F.3d 588, 592 (8th Cir. 1996)("[W]e presume state court findings of fact to be correct in habeas proceedings unless the petitioner establishes, the respondent admits, or the record shows otherwise."), cert. denied, 521 U.S. 1127 (1997).  Thus, "[f]actual findings by the state court 'shall be presumed to be correct,' a presumption that will be rebutted only 'by clear and convincing evidence.'" Kinder v. Bowersox, supra at 538, citing Title 28 U.S.C. §2254(e)(1).

B.     Legal Analysis.  We address each of the Petitioner's Grounds for Habeas relief in turn.

1.    <u>Claim One:  Application of SDP Act to Non-Sex Offenders</u>.  The Petitioner claims that his current confinement is unconstitutional, because he has been committed, under Minnesota's SDP statute, even though he has never been convicted of criminal sexual conduct.  The Petitioner acknowledges that the SDP Statute, itself, does not require an individual to be a convicted sex offender in order to be an SDP.  However, he contends that the Statute is unconstitutionally "overbroad," and violates the precepts of "Substantive Due Process," because it allows an individual to be committed as an SDP, even though that individual has never been convicted of a criminal sex offense.  According to the Petitioner, the Federal Constitution mandates that "only people criminally convicted of actual sexual assault are eligible for sexually dangerous civil commitment."  <u>Petitioner's Memorandum</u>, supra at p. 49.

The Petitioner has cited three Supreme Court cases in support of his first claim for relief -- <u>Kansas v. Hendricks</u>, 521 U.S. 346 (1997); <u>Kansas v. Crane</u>, 534 U.S. 407 (2002); and <u>Foucha v. Louisiana</u>, 504 U.S. 71 (1992).  None of those cases, however, supports his application for a Writ of Habeas Corpus.

At the outset, we note that the Supreme Court never directly held, in <u>Hendricks</u>, <u>Crane</u>, <u>Foucha</u>, or any other case, that a prior sex offense conviction is an absolute, constitutional prerequisite for the civil commitment of sexually dangerous individuals.

- 30 -

Therefore, we find that the lack of a criminal sexual conduct conviction does not cause the Petitioner's current commitment to be "contrary to" any Supreme Court precedent.

We are also persuaded that the Petitioner's SDP commitment, without a past sex offense conviction, does not manifest an objectively unreasonable application of any Supreme Court precedent. We find nothing, in any Supreme Court decision, which suggests that only previously convicted sex offenders can be civilly committed as sexual predators, or sexually dangerous persons. In Hendricks and Crane, the Supreme Court considered challenges to the constitutionality of Kansas' "Sexually Violent Predator Act." The Kansas statute, unlike Minnesota's SDP Statute, is applicable only to individuals who have been charged, or convicted, for criminal sexual conduct. Therefore, unlike the Petitioner here, the civilly committed sexual predators, who were before the Supreme Court in Hendricks, and Crane, had been convicted of sex offenses in the past.

In Hendricks, the Court specifically noted that, under the Kansas statute at issue, "[c]ommitment proceedings can be initiated only when a person 'has been convicted of or charged with a sexually violent offense.'" Kansas v. Hendricks, supra at 357. The Court found that to be significant, because it showed that the Kansas statute "requires proof of more than a mere predisposition to violence; rather, it

- 31 -

requires evidence of past sexually violent **behavior**." Id. [emphasis added].  The Court added that "'[p]revious instances of violent **behavior** are an important indicator of future violent tendencies.'" Id. at 358, quoting Heller v. Doe, 509 U.S. 312, 323 (1993)[emphasis added].  Hendricks suggests that a person's past sexual misconduct should be an important consideration whenever a State seeks the civil commitment an accused sexual predator.  However, Hendricks does not hold, nor even imply, that being previously charged or convicted of a criminal sexual offense is an essential constitutional requirement for civil commitment.  To the contrary, Hendricks uses the word "behavior," not "charge" or "conviction," to describe what the Court considers to be "an important indicator" of the potential for future dangerous conduct.

While it is true that the Minnesota SDP Statute does not require proof of a prior sex offense conviction, the Statute does require proof of prior injurious sexual behavior -- more specifically, a prior "course of harmful sexual conduct." Minnesota Statutes Section 253B.02, Subdivision 18c(1).  The United States Supreme Court has not held -- nor so much as intimated -- that this is constitutionally insufficient.  While it may be unusual for a person to be civilly committed under a sexual predator statute, without having been previously charged or convicted of a criminal sex offense, individuals are often civilly committed under other statutes, based on circumstances

that do not involve criminal activities.  See, e.g., <u>Youngberg v. Romeo</u>, 457 U.S. 307

(1982)(considering claims brought by a person who was involuntarily committed due

to mental retardation); <u>Addington v. Texas</u>, 441 U.S. 418, 421 (1979)(considering

claims brought by a person who was civilly committed based on psychiatrists'

opinions that he "suffered from psychotic schizophrenia," and "paranoid tendencies,"

that caused him to be "probably dangerous both to himself and to others").

    As the Supreme Court stated in <u>Hendricks</u>:

> The State may take measures to restrict the freedom of the
> dangerously mentally ill.  This is a legitimate nonpunitive
> governmental objective and has been historically so
> regarded.

<u>Kansas v. Hendricks</u>, supra at 363.

We find nothing in <u>Hendricks</u>, nor in any other Supreme Court decision, which

suggests that past criminal conduct is a constitutional prerequisite for civil

commitment.   Rather, the crucial showings for a constitutionally valid civil

commitment are (1) a "mental abnormality," and (2) a "prediction of future

dangerousness." <u>Id</u>. at 360.  Proof of prior criminal conduct, on the other hand, has

**not** been identified as a constitutional necessity.

    In sum, if a person suffers from a mental disease, defect, or disorder, which

makes him dangerous to himself, or others, he can be civilly committed, even if he has

not committed a crime.   Therefore, we conclude that the Minnesota Courts did not apply any United States Supreme Court case law in an "objectively unreasonable" manner, by allowing the Petitioner to be civilly committed, as an SDP, even though he had not been previously convicted of, or charged, with a criminal sexual offense.

      2.    Claim Two:  Appellate Court's Determination of Control Issue. The Petitioner next challenges the constitutionality of the Minnesota Court of Appeals' determination, that he lacked adequate control over his harmful sexual impulses.  See Martin I, at 639-40 ("[W]e conclude that the evidence here compels a finding that [the Petitioner's] personality disorder does not allow him to adequately control his harmful sexual impulses and behavior.").[14]  This claim is based on the United States Supreme Court's decision in Addington v. Texas, supra.

In Addington, the Supreme Court held that, in civil commitment cases, the standard of proof required by the Constitution is more than a mere "preponderance of the evidence," but less than the "beyond a reasonable doubt" standard that is applied

---

[14]The Petitioner also contends that the Court of Appeals erroneously determined that he had engaged in a course of harmful sexual conduct toward Jill.  However, as we have already noted, that determination is immaterial, because the Trial Court had already determined that the Petitioner had engaged in a course of harmful sexual conduct toward Jane.  In any event, our analysis of the Petitioner's second claim for relief is fully applicable to all of the Court of Appeals' determinations that the Petitioner is challenging.

in criminal cases.  <u>Addington v. Texas</u>, supra at 432-33.  The appropriate "middle level" standard of proof, that is required in civil commitment cases pursuant to <u>Addington</u>, is most commonly described as the "clear and convincing evidence" standard.  See, <u>Demore v. Kim</u>, 538 U.S. 510, 550 (2003); <u>M.L.B. v. S.L.J.</u>, 519 U.S. 102, 118-19 n.10 (1996); <u>Brandt Distributing Co., Inc. v. Federal Ins. Co.</u>, 247 F.3d 822, 824 (8th Cir. 2001).

Here, the Petitioner contends that the Minnesota Court of Appeals is constitutionally forbidden from applying the standard of proof mandated by <u>Addington</u> since, in his words, "the conclusion that the requisite clear and convincing evidentiary standard has been satisfied can **only** be made by a fact-finder able to evaluate the evidence and witness testimony from the courtroom perspective." <u>Petitioner's Memorandum</u>, supra at p. 64 [emphasis in the original].  According to the Petitioner, "[a] de novo evaluation by the appellate court of the evidence and testimony months after the conclusion of a commitment trial cannot meet the clear and convincing evidentiary standard required by <u>Addington</u>." <u>Petitioner's Memorandum</u>, supra at p. 64.

Our analysis begins by noting that, in <u>Martin I</u>, the Minnesota Court of Appeals explicitly acknowledged <u>Addington</u>'s "clear and convincing evidence" requirement.

Martin I, supra at 639 ("An appellate court determines whether a commitment is supported by clear and convincing evidence."). Thus, it plainly appears that the Minnesota Court of Appeals correctly understood, and applied, the constitutionally mandated standard of proof for a civil commitment case. The Petitioner does not appear to dispute this point.

Instead, the Petitioner contends that the Constitution specifically prohibits a State **Appellate** Court from making its own determination as to whether the requirements for a civil commitment have been proven by clear and convincing evidence. According to the Petitioner, the Federal Constitution mandates that only a Trial Court can make that determination. We disagree. In support of his position, the Petitioner has failed to cite any United States Supreme Court decision that directly supports his second claim for relief. Therefore, it cannot be said that the Minnesota State Courts acted "contrary to" any holding of the Supreme Court. See, Williams v. Taylor, supra at 412-13.

The Petitioner has also failed to show that the State Courts applied any Supreme Court precedent in an objectively unreasonable manner. The Addington decision, which is the only Supreme Court decision cited in support of the Petitioner's second claim for relief, says only that the requirements for a civil commitment must be

proven by clear and convincing evidence.   Nothing in Addington states, or even implies, that only Trial Courts are constitutionally authorized to determine whether the clear and convincing standard has been met.

The Respondent contends that the ruling at issue -- i.e., the Minnesota Court of Appeals' determination that the Petitioner lacks adequate control over his harmful sexual impulses -- is really a "conclusion of law," rather than a "finding of fact." Therefore, the Respondent argues, the Court of Appeals was fully competent to independently resolve the lack of adequate control issue.   Respondent's Memorandum, Docket No. 8, at pp. 35-36.  While we find that argument persuasive, we do not find it to be the only rationale for rejecting the Petitioner's second claim for relief.

Even if we accepted the Petitioner's contention, that "lack of adequate control" is a finding of fact, and not a conclusion of law, we still would reject his claim, since we find nothing in the Constitution that prohibits a State Appellate Court from making its own factual determinations, based upon its own review of the record, at least in cases in which a Jury Trial is not mandated.  Indeed, the Supreme Court has held that, for purposes of Federal Habeas Corpus review, there is "no distinction between the factual determinations of a state trial court and those of a state appellate court."

Sumner v. Mata, 449 U.S. 539, 546 (1981); see also, Weaver v. Bowersox, 241 F.3d 1024, 1031 (8th Cir. 2001)("Findings of fact made by state appellate courts have the same presumptive correctness as findings of fact made by state trial courts."); see also, Jones v. Crow Wing County, 2006 WL 2067737 at *1 n.2 (D. Minn., July 24, 2006)(citing cases).  Nor, for reasons we later detail, see, infra at pp. 40-41, is there any legitimacy to the Petitioner's argument that, for civil commitment proceedings, he is entitled to a Jury Trial.

As a consequence, we conclude that the Minnesota Court of Appeals did not violate the Petitioner's Federal constitutional rights by making its own determination, based on its own review of the evidentiary Record, that the Petitioner lacks adequate control over his harmful sexual impulses.

3.     Claim Three:  Need for Specific Finding of Inadequate Control. In his third claim for relief, the Petitioner contends that, in his case, the Minnesota Court of Appeals effectively eliminated "a separate determination of 'inability to control behavior.'" Petitioner's Memorandum, supra at p. 66.  He argues that the "establishment of a personality disorder in an accused person, now automatically establishes the person's 'inability to control' (formerly the third free-standing element in the SDP commitment process)." Id.

- 38 -

If the Record in this case supported the Petitioner's contention, he might have a viable claim, since lack of adequate control over harmful sexual impulses is indeed a constitutional prerequisite for the civil commitment of sexually dangerous individuals.  As the Supreme Court plainly stated in Crane, "there must be proof of serious difficulty in controlling behavior."  Kansas v. Crane, supra at 413; see also Kansas v. Hendricks, supra at 358 (approving sexual predator statute because it permitted "involuntary civil confinement" only for "those who suffer from a volitional impairment rendering them dangerous beyond their control").

However, the Record in this case does **not** support the Petitioner's claim that the lack of control requirement has been eliminated, or "supplanted." See, Petitioner's Memorandum, supra at p. 66.  In Martin I, the Court of Appeals expressly reaffirmed that an SDP commitment "'requires a finding that a person lacks some control over his or her sexually dangerous actions.'" Martin I, supra at 639, quoting In re Linehan, supra at 868.  The Court also expressly stated that "the evidence here compels a finding that [the Petitioner's] personality disorder does not allow him to adequately control his harmful sexual impulses and behavior." Id. at 639-40.  In Martin II, the Court reiterated that "Martin I specifically determined that [the Petitioner] lacks the ability to adequately control his harmful sexual impulses and behavior." Martin II,

- 39 -

supra at *3.  Frankly, it is difficult to imagine how the Minnesota Court of Appeals could have made it more plain that Minnesota's SDP Statute **does** include a lack of adequate control requirement, and that the lack of adequate control requirement was satisfied in the Petitioner's case.  Therefore, we reject the Petitioner's unsupported contention that "Minnesota has altered the interpretation of the SDP statute to no longer require that a separate finding of 'lack of adequate control' be made." Petitioner's Reply, supra at p. 10.

    4. Claim Four:  Right to a Jury Trial.  In the Petitioner's fourth claim for relief -- appearing as Ground Two of the Petition -- he contends that the Constitution's Due Process Clause guarantees a right to a Jury Trial in SDP cases. The Petitioner has presented an appealing argument in support of his Jury Trial claim, and has offered cogent reasons why an individual, who faces an indeterminate detention as an SDP, should have the right to a Jury deciding his fate.  See, Petitioner's Memorandum, supra at pp. 67-77.

  However, as the Petitioner candidly acknowledges, the United States Supreme Court has never held that a Jury Trial is required for civil commitments.  Id. at p. 68. Therefore, the Minnesota State Courts' rejection of the Petitioner's Jury Trial claim

is not "contrary to * * * clearly established Federal law, as determined by the Supreme Court of the United States." <u>Title 28 U.S.C. §2254(d)</u>.[15]

Furthermore, our Court of Appeals, whose rulings are binding on us, has already determined that the absence of a Jury Trial, in SDP cases, does not constitute an "unreasonable application" of Supreme Court case law.  In <u>Poole v. Goodno</u>, 335 F.3d 705 (8th Cir. 2003), our Court of Appeals carefully considered the very same arguments that the Petitioner raises here, namely, that Minnesota's SDP statute does not satisfy the requirements of the Constitution's Due Process Clause, because it does not afford a right to a Jury Trial.  The Court of Appeals squarely rejected this claim, and held as follows:

> [T]he Minnesota state court decision declining to grant a jury trial in [the SDP's] case is not contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court.  There is no clearly

---

[15]The Petitioner makes no argument that the denial of a Jury Trial also violated the Constitution of the State of Minnesota but, even if he had, the argument has long been rejected by the Minnesota Courts.  See, <u>State ex rel. Pearson v. Probate Court of Ramsey County</u>, 205 Minn. 545, 550, 287 N.W. 297, 300 (1939), aff'd, 309 U.S. 270 (1940); see also, <u>Joelson v. O'Keefe</u>, 594 N.W.2d 905, 910 (Minn.App. 1999), rev. denied (Minn., July 28, 1999).  "[W]e lack authority to review the Minnesota state courts' interpretation and application of state law, for 'federal habeas corpus relief does not lie for errors of state law * * * [and] it is not the province of a federal habeas court to reexamine state-court determinations on state law.'" <u>Evenstad v. Carlson</u>, 470 F.3d 777, 782 (8th Cir. 2006), quoting <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991).

established Supreme Court law which holds that due
process requires a jury trial in civil commitment
proceedings or that incorporates the Seventh Amendment
right to a jury for such cases.

Id. at 710-11; see also, Rubin v. Mooney, 2006 WL 1050540 at *1 (D. Minn., April 20, 2006).

Since we are bound to follow Poole, we are obligated to reject the Petitioner's argument that he was entitled, under the United States Constitution, to a Jury's resolution of the facts relating to his civil commitment.

     5.    Claim Five: Equal Protection -- Incarceration for Thoughts. The Petitioner describes his fifth claim for relief as involving "Minnesota's use of the SDP Act to incarcerate [the Petitioner] for his alleged 'thoughts' of criminal sexual conduct, without allowing for similar confinement of other non-mentally ill people who have 'thoughts' of non-sexual criminal conduct," thereby violating the Equal Protection Clause "as held by the Supreme Court in Foucha." Petitioner's Memorandum, supra at p. 79.

     The Petitioner's claim is based on a false premise, namely, that the Petitioner has been civilly committed, as an SDP, solely because of his "thoughts" about committing criminal sexual conduct. The Record before us demonstrates, incontrovertibly, that the Petitioner was not found to be an SDP simply because he

had, and has, thoughts of committing sex offenses.   The Minnesota State Courts determined that the Petitioner is an SDP because there is clear and convincing evidence, in the Trial Court Record, which shows that he has engaged in a course of harmful sexual conduct in the past; he currently suffers from a mental disorder; as a result of his mental disorder, he does not have adequate control over his harmful sexual impulses; and, because of his mental disorder, and the resulting lack of control over his harmful sexual impulses, it is highly likely that he will engage in further harmful sexual conduct in the future.   Those findings distinguish the Petitioner, and all other civilly committed SDPs, from non-mentally ill individuals who have thoughts about committing non-sexual criminal conduct, but have not acted on those thoughts. In contrast, the Petitioner acted on his thoughts and committed both State and Federal offenses.

In order to substantiate an Equal Protection claim, the claimant must "demonstrate[ ] that she [or he] was treated differently than others who were similarly situated to her [or him]." Klinger v. Department of Corrections, 31 F.3d 727, 731 (8th Cir. 1994), cert. denied, 513 U.S. 1185 (1995); see also, Greer v. Amesqua, 212 F.3d 358, 370 (8th Cir. 2000); Johnson v. City of Minneapolis, 152 F.3d  859, 862 (8th Cir. 1998).  Individuals who are found to be SDPs under Minnesota law are **not** similarly

situated to non-mentally ill people who think about committing non-sexual offenses. SDPs have been found, by clear and convincing evidence, to be suffering from a mental disorder, which deprives them of adequate volitional control over their harmful sexual impulses, and causes them to be highly likely to commit harmful sexual conduct in the future. Consequently, SDPs are distinctly different than non-mentally ill people who think about committing non-sexual criminal offenses, but refuse to act on their thoughts. Therefore, SDPs can be treated differently, without violating the Equal Protection Clause. See, Klinger v. Department of Corrections, supra at 731 ("Dissimilar treatment of dissimilarly situated persons does not violate equal protection.").

6. Claim Six: Equal Protection -- Standard of Review. Next, the Petitioner claims that he was deprived of his constitutional right to Equal Protection, because the Minnesota Court of Appeals, in Martin I, reversed the Trial Court's finding that he was not an SDP. The Petitioner maintains that Martin I established, and employed, a novel and unconstitutional way to review a Trial Court decision, which has caused him, and other putative SDPs, to be treated differently than other individuals who face other forms of civil commitment. See, Petitioner's Memorandum, supra at pp. 80-81.

- 44 -

As we have already noted, the Minnesota Court of Appeals described its standard of review, in <u>Martin I</u>, as follows:

> A district court's conclusions regarding whether the record supports, by clear and convincing evidence, the requirements of the SDP statute are questions of law that we review de novo.

<u>Martin I</u>, at 638.

The Petitioner has not cited any Minnesota State Court decision that has applied a different standard of review in a civil commitment case. Moreover, our own independent research suggests that the standard of review, as detailed in <u>Martin I</u>, has been consistently employed in all types of civil commitment procedures. For example, in <u>In re Carey</u>, 2003 WL 21791597 at *1 (Minn. App., August 5, 2003), a woman challenged a Trial Court decision "committing her as mentally ill and authorizing involuntary administration of neuroleptic medication." The Court of Appeals ruled that, "[w]hether the evidence is sufficient to meet the standard for civil commitment is a legal question, which we review de novo." <u>Id</u>. at *4. The standard, there, is virtually identical to the standard of review applied in <u>Martin I</u>.

Similarly, in <u>In re Civil Commitment of Carlson</u>, 2003 WL 1908180 at *1 (Minn. App., April 22, 2003), a schizophrenia patient was civilly committed because of his mental illness. There, the Court of Appeals applied the same <u>de novo</u> standard

- 45 -

of review that was employed in <u>Martin I</u>. <u>Id</u>. at *3 ("Whether the evidence is sufficient to meet the standard for civil commitment is a legal question, which we review de novo."); see also, <u>In re Martinelli</u>, 649 N.W.2d 886, 889 (Minn. App. 2002)("Whether the record provides clear and convincing evidence meeting the standards established for civil commitment is a question of law that this court reviews de novo," and "[t]he narrower question of what standard <u>Crane</u> establishes, and whether [a putative SDP] meets it, is also a question of law."), cert. denied, 538 U.S. 933 (2003).

Accordingly, we find that the Petitioner's sixth claim for relief, which contests the standard of review applied in <u>Martin I</u> on Equal Protection grounds, is wholly unsubstantiated.  In the absence of specific Minnesota case law, which demonstrates that a different standard of review has been applied in circumstances similar to the Petitioner's, we are not able to accept his Equal Protection argument.

7.    <u>Seventh Claim:  Equal Protection -- Evaluation and Treatment</u>. The Petitioner's final claim is that he is being denied Equal Protection because, allegedly, Minnesota does not provide the same evaluation, and treatment services, for all categories of civilly committed detainees.  He contends that SDPs are treated differently, and less favorably, than other types of civilly committed detainees.  The

Petitioner specifically claims that "Minnesota's application and enforcement of the SDP Act denies the same treatment opportunities enabling a committed person to be released on the same basis as its citizens committed underneath other civil statutes." Petitioner's Memorandum, supra at p. 82.  Unfortunately for his cause, the claim suffers from several fatal flaws.

First, the Petitioner has not cited any evidence, or legal authority, which supports his conclusory assertion that all civilly committed individuals, except SDPs, receive appropriate evaluations, and treatment opportunities.  In fact, the Minnesota Civil Commitment Statute, Minnesota Statutes Section 253B, includes a single treatment provision that applies to all classes of civilly committed persons, including SDPs.  Minnesota Statutes Section 253B.03, Subdivision 7, provides that every person, who is civilly committed in Minnesota as an SDP, or otherwise, "has the right to receive proper care and treatment, best adapted, according to contemporary professional standards, to rendering further supervision unnecessary."  The universal application of this Statute to all civilly committed persons effectively refutes the Petitioner's final Equal Protection claim.

Furthermore, there is evidence in the Record that the MSOP tried to assess and evaluate the Petitioner before the Trial Court entered the final indeterminate

commitment Order, but the Petitioner "participated only minimally in the assessment and interview process," and he "declined to submit to psychological testing by [a] psychologist." See, Appendix, supra at p. 159. In addition, MSOP officials noted that the Petitioner was "refusing to participate in sex offender treatment." Id. at p. 160. The Petitioner apparently believes that the proffered treatment was not suitable, because he is not a convicted sex offender. However, the fact remains that the MSOP has been willing to provide treatment, which the MSOP staff believes would be helpful to the Petitioner. Therefore, we are unable to conclude, on the clear and convincing evidence presented, that the Petitioner has not been offered evaluation and treatment.

Finally, even if the Petitioner could prove that he has been receiving inadequate treatment under the MSOP, that would not be a sufficient reason to grant him a Writ of Habeas Corpus that would invalidate his commitment. If the Petitioner were being denied suitable treatment for the condition, which led to his civil commitment, he might be afforded some other legal remedy, but his relief would not entitle him to a release from custody where, as here, his relief has been adjudged to be against the public interest. Simply put, the alleged inadequacy of the Petitioner's post-commitment treatment has no legitimate bearing on the constitutional validity of the

commitment Order itself.  For this additional reason, the Petitioner is not entitled to a Writ of Habeas Corpus on his final claim for relief.[16]

### IV.  Motion For an Order and Injunction

We have also considered the Petitioner's pending "Motion for Order and Injunction," see, Docket No. 16, which is currently before us.  In that Motion, the Petitioner contends that he has been deprived of certain "paperwork," and computer disks, which we assume pertain to this action, or to other legal proceedings.  He seeks a Court Order that would compel MSOP authorities to return the allegedly missing items.  The Petitioner does not claim that the alleged deprivation of those materials has affected his ability to present his arguments in this case, although he suggests it might impair any future filings.

Since the relief that the Petitioner is seeking in this Motion has no direct bearing on his challenge to his confinement, it would not be appropriate to address that Motion here.  See, Kruger v. Erickson, 77 F.3d 1071, 1073 (8th Cir. 1996)("If the

---

[16]The Petitioner also claims that SDPs do not have the same release rate as other civilly committed detainees, but this claim, like his lack of treatment claim, has no direct bearing on the validity of the underlying Commitment Order at issue here.  If the Petitioner believes that SDPs are treated differently, and unconstitutionally, when it comes to dischargeability, he will have to pursue that argument when he meets the criteria for release from commitment.

prisoner is not challenging the validity of his conviction or the length of his detention, * * * then a writ of habeas corpus is not the proper remedy."); see also, Otey v. Hopkins, 5 F.3d 1125, 1130 (8th Cir. 1993)("The central focus of the writ of habeas corpus is to provide a remedy for prisoners who are challenging the fact or duration of their physical confinement and are seeking immediate release or a speedier release."), cert. denied, 512 U.S. 1246 (1994); Badea v. Cox, 931 F.2d 573, 574 (9th Cir. 1991)("Habeas corpus proceedings are the proper mechanism for a prisoner to challenge the 'legality or duration' of confinement * * *[;] [a] civil rights action, in contrast, is the proper method of challenging 'conditions of * * * confinement.'") [internal citation omitted].  While the Petitioner may be able to assert a claim for the return of his missing materials in an administrative grievance, as an action for damages under Title 42 U.S.C. §1983, or otherwise, we have no basis to adjudicate it here.  See, Khaimov v. Crist, 297 F.3d 783, 785-86 (8th Cir. 2002)("[A] prisoner's action challenging the validity or length of confinement must be brought in habeas, but a challenge to conditions of confinement should be brought under section 1983 so long as the relief sought does not have the effect of invalidating the underlying conviction."), citing Heck v. Humphrey, 512 U.S. 477, 481-82 (1994).  Therefore, we

recommend that the Petitioner's Motion for an Order and Injunction be denied, but without prejudice.

NOW, THEREFORE, It is –

RECOMMENDED:

1.  That the Petitioner's application for Habeas Corpus Relief under Title 28 U.S.C. §2254 [Docket No. 1] be denied.

2.  That the Petitioner's pending "Motion for Order and Injunction" [Docket No. 16] be denied without prejudice.

3.  That this action be dismissed with prejudice.


Dated:   March 22, 2007                    s/Raymond L. Erickson
                                           Raymond L. Erickson
                                           CHIEF U.S. MAGISTRATE JUDGE

**N O T I C E**

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than April 6, 2007**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections. Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than April 6, 2007**, unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.